**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Charles Mastowski, et al., | No. CV-15-01893-PHX-NVW |
| Plaintiffs, | **ORDER** |
| v. | |
| American National Property and Casualty Company, | |
| Defendant. | |

Before the Court is a Motion for Summary Judgement (Doc. 99) filed by defendant American National Property and Casualty Company ("American National") against plaintiffs Charles and Sondra Mastowski ("the Mastowskis"). After this motion had been briefed, the parties provided supplemental briefing at the Court's request. (Docs. 127, 128, 130.) Also before the Court are two motions to preclude expert testimony: one filed by American National (Doc. 104), and one filed by the Mastowskis (Doc. 98). The Court now considers these and all accompanying briefing.

**I.    FACTUAL BACKGROUND**

The following facts are construed in the light most favorable to the plaintiffs.

In the early morning hours of August 29, 2014, police received a call from an unknown male reporting light smoke emanating from the Mastowskis' home in Superior, Arizona. (Doc. 101 at 2; Doc. 118 at 2.) Fire crews arrived and extinguished what

turned out to be a substantial fire that had done considerable damage to the house and its contents. (Doc. 101-6 at 17.) Police also arrived on scene, including Detective Bryan Lawrence, Chief of Police Mark Nipp, and Officer Anthony Doran from the Superior Police Department. (Doc. 101 at 2; Doc. 118 at 2.) The Mastowskis, however, were not home. Several hours earlier they had embarked on an overnight drive to Henderson, Nevada, where they planned to visit their son. (Doc. 101 at 2; Doc. 118 at 13.) A restaurant receipt shows they had made it to Kingman, Arizona, about 250 miles from Superior, by 6:42 AM that morning. (Doc. 101-5 at 31; Doc. 118 at 14.) After assessing the scene, the police department called Sondra and suggested she and her husband return as soon as possible. (Doc. 101 at 4; Doc. 118 at 2.) The Mastowskis immediately filed a claim under their fire insurance policy; their provider, defendant American National, opened a claim on the policy on August 29, 2014. (Doc. 118 at 19.) The claim was for $102,993.11. (Doc. 101 at 11; Doc. 118 at 5.)

The day the claim was filed American National hired investigator Robert Buffington and appraiser Scott Bumm to evaluate the Mastowskis' losses. (Doc. 101 at 4; Doc. 118 at 2.) Over several reports stretching from one day to ten months after the fire, Buffington found no evidence of flammable liquids starting the fire, forced entry to the home, or that the fire was started by accident.[1] (Doc. 101 at 4, 7, 21; Doc. 118 at 2-3, 4, 10.) The final report he submitted to American National in June of 2015 concluded that the fire, which started in four separate areas of the house, was the product of "human involvement," though he could draw no conclusions about the source of ignition. (Doc. 101 at 21; Doc. 118 at 8.) Under a section entitled "Recommended work to be performed," Buffington listed, among other things, "Fire modeling can be completed by an engineer, if necessary." (*Id.*) "Fire modeling" is a form of mathematical modeling used to calculate a fire's duration and trajectory. (Doc. 118 at 24.) American National did not conduct fire modeling, though an expert retained by the Mastowskis insists it

---

[1] The Mastowskis' private investigator says he found evidence of forced entry when he examined the house in December of 2015—well over one year after the fire took place. (Doc. 118 at 26.)

should have been done in the course of the investigation. (Doc. 118 at 24.)

As for who started the fire, the Superior Police Department considered the Mastowskis themselves the prime suspects. (Doc. 101 at 5; Doc. 118 at 3.) A report produced by the Casa Grande Fire Department on September 3, 2014, concluded the fire was "incendiary," and that ignition "by an open-flame ignition source such as a match or a lighter" was the "most probable cause of the fire." (Doc. 101-1 at 25.) The report also noted that the house was "secured" (i.e., locked) when firefighters arrived. (*Id.* at 18.) There were no signs of forced entry noted at the time. (*Id.* at 25.) In light of all this, American National transferred the claim to its special investigation unit based on a decision by its Property Loss Claims Committee. (Doc. 101 at 6; Doc. 118 at 3.) On September 5, 2014, American National also retained a lawyer to investigate the claim. (Doc. 99 at 4; Doc. 101 at 6; Doc. 118 at 3.)

American National's continued investigation yielded a report about the Mastowskis' neighbors, who, according to the report, told investigators that the Mastowskis were "loners" who kept to themselves and had recently put significant work into their home. (Doc. 101 at 8; Doc. 118 at 4.) American National went on to collect the Mastowskis' financial records, cell phone records, and service call records from the Superior Police Department. (Doc. 101 at 9-10.) At American National's behest, Charles and Sondra then each completed two oral examinations under oath, one on November 6, 2014, and one on March 13, 2015.[2] (Doc. 101 at 12; Doc. 118 at 5; Doc. 101 at 19) The first round turned up inconsistencies in the Mastowskis' respective accounts of whether and when they might have lost an extra electronic opener to their garage. (Doc. 101-4 at 31.) A detective also submitted a report to American National's attorney noting, among other things, that nothing of value was stolen from the home

---

[2] American National makes several assertions about what the Mastowskis said in the second round but fail to attach any of their actual testimony to the record. (Doc. 101 at 19; Doc. 101-4 at 17-25; Doc. 101-5 at 22-29.) The Mastowskis dispute American National's characterization. (Doc. 118 at 8.) In light of the standard of review on summary judgment, the Court's decision therefore does not give any weight to American National's assertions about the testimony given in the March 13 examinations.

before the fire and that Charles never retrieved several guns police officers had removed from the property the day of the fire. (Doc. 101-5 at 10.)

On May 31, 2015, American National's retained counsel produced a recommendation and opinion letter detailing his investigation findings. (Doc. 101-5.) Many of the findings echoed those made previously by local fire officials and by American National's hired investigator. However, the letter also set out a theory that the Mastowskis may have had a financial motive to set the fire. While the investigation revealed the Mastowskis had kept up timely payments on their automobiles, the letter detailed several other indications that they may have been experiencing financial hardship at the time of the fire. Specifically, the letter stated that the Mastowskis had once filed for bankruptcy (without specifying when), that they purchased their house in 2013, but that Charles was periodically unemployed between August of 2013 and April of 2014, at which time a serious illness caused him to leave his job with a mining company indefinitely. (Doc. 101-5 at 51-52.) The letter informed American National that the Mastowskis had recently cashed out Charles's pension worth $35,000 and used about $28,000 to repay their daughter for money they had borrowed to pay off credit card and gambling debts. (Doc. 101-5 at 52.) The letter also stated that "$20,000 was transferred to savings on August 26, 2014" (*id.*), though it offered no details about where that money came from, whose savings account it went to, and whether that money was readily accessible to the Mastowskis afterward. The letter noted two other possible suspects for the fire: one of several individuals connected to a December 2013 break-in across the street from the Mastowskis, as well as an unknown male who was photographed in the Mastowskis' driveway on September 10, 2014. (Doc. 101-5 at 53.) The letter provided no other details regarding evidence for or against either of these suspects, except to note that "[t]he involvement of a disgruntled contractor or person or persons in possession of keys or the garage controller to the Mastowski residence is possible." (Doc. 101-5 at 54.)

Ultimately the letter stated:

Taken as a whole evidence of a greater weight, more convincing evidence, establishes the following:

1. The Mastowskis had motive and opportunity to cause the loss;

2. There was no forced entry;

3. Nothing was stolen or removed from the premises including items with street value like tools, golf clubs, guns and electronics;

4. The next door burglary involved forced entry and theft as well as damage to the premises;

5. There was no damage to the Mastowski residence except by the fires;

6. The fires were set in an attempt to burn the premises completely however [sic], an obvious and useful tool for this arson, charcoal lighter fluid, was left unused on the Kitchen island despite the fact that at least three fires were attempted to be started in the Kitchen;

7. The Mastowskis would have gained a new residence, a personal property check in the amount of tens of thousands of dollars and had their living expenses paid while waiting for the premises to be rebuilt;

8. The Mastowskis would have been able to live in Mesa, AZ where Mr. Mastowski was receiving treatment for his medical condition.

(Doc. 101-5 at 57.) The letter recommended denying the claim "due to the insured's, Charles and Sondra Mastkowskis' intentional involvement." (*Id.*)

Days after its retained counsel issued this letter, American National denied the Mastowskis' insurance claim in a sixteen-page letter dated June 23, 2015. (Doc. 101 at 22; Doc. 118 at 9.) The denial letter laid out American National's rationale for its decision, which hinged largely on evidence from its ten-month investigation pointing to the Mastowskis as having some involvement in burning down their house. (Doc. 101-6 at 19-34.) The letter quoted language from the Mastowskis' policy that excluded coverage where the policyholder engages in "Concealment or Fraud" either before or after a loss.

(Doc. 101-6 at 28-29.) It further quoted language reserving the company's right to deny claims "[d]ue to material failure to cooperate and/or concealment." (Doc. 101-6 at 31-32.) In arriving at its conclusion, American National stated that the company

> has also considered the expressed positions of the Mastowskis including but not limited to, their position that they did not cause the fires and their counsel's position that the fires were set by using multiple delay devices and, that the Mastowskis could not have caused the fires because they were not present at the fires [sic] discovery, instead [sic] they were in or near Kingman, AZ.

(Doc. 101-6 at 26.) The letter closed repeating word for word the eight conclusions reached by American National's retained counsel. (Doc. 101-6 at 27-28.) The primary justification American National cited for denying the claim was "the intentional act of arson and concealment of information from the company." (Doc. 101 at 24; Doc. 118 at 10.) The secondary justification cited was "material noncooperation." (*Id.*)

The Mastowskis filed suit in Maricopa County Superior Court on August 26, 2015, alleging breach of contract and bad faith. The case was removed to this Court on September 21, 2015. (Doc. 1.)

## II. LEGAL STANDARDS

Summary judgment should be granted if the evidence reveals no genuine dispute about any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A material fact is one that affects the outcome of the action under the governing law, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

It is the moving party's burden to show there are no genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Upon such a showing, however, the burden shifts to the non-moving party, who must then "set forth specific facts showing that there is a genuine issue for trial" without simply resting on the pleadings. *Anderson*, 477 U.S. at 256. To carry this burden, the nonmoving party must do more than simply show

there is "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.* at 587. "A court must view the evidence 'in the light most favorable to the [non-moving] party.'" *Tolan v. Cotton*, — U.S. —, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 249).

### III. ANALYSIS

#### A. Breach of Contract

American National first seeks summary judgment on the Mastowskis' breach of contract claim. American National argues that the Mastowskis' insurance policy expressly excluded coverage for losses caused by the policyholders' "intentional acts." (Doc. 127 at 3-4.) The Mastowskis argue that American National is precluded from making this argument because it "had not raised this defense of coverage in the denial letter." (Doc. 128 at 3.) Alternatively, they argue that a factfinder could reasonably conclude from the direct and circumstantial evidence on the record that they did not commit arson, rendering summary judgment inappropriate. (Doc. 128 at 7-9.)

In its letter denying coverage, American National specifically said: "The first basis for the Company's denial of the claim is *the intentional act of arson* and its concealment from the Company under the policy language which appears at page 17 of Form SH-3.02 (8-07)." (Doc. 101-6 at 28 (emphasis added).) True, American National did not cite to the policy's exact exclusion provision dealing with intentional acts. The letter quotes policy language only from a separate provision addressing "Concealment or Fraud." (*Id.*) But American National made crystal clear that "the intentional act of arson" was its first basis for denying coverage. The Mastowskis had sufficient notice that their claim was being denied for that reason and are in no way prejudiced by American National's argument made here.

However, summary judgment is not appropriate because whether American National breached the insurance agreement depends on whether the intentional acts exclusion did in fact apply—i.e., whether the Mastowskis had intentional involvement in setting the fire. American National bears the burden of showing, by a preponderance of the evidence, that the intentional acts exclusion applied. *See Keggi v. Northbrook Property & Cas. Ins. Co.*, 199 Ariz. 43, 46, 13 P. 3d 785, 788 (Ct. App. 2000) ("Generally, the insured bears the burden to establish coverage under an insuring clause, and the insurer bears the burden to establish the applicability of any exclusion."). American National may have a strong case from circumstantial evidence and improbability of any other cause, but it has not shown conclusively that the Mastowskis' intentional involvement is the only conclusion a factfinder could reach.

### B. Bad Faith

American National also seeks summary judgment on the Mastowskis' claim of bad faith. Arizona law recognizes in every contract an implied covenant of good faith and fair dealing. *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 490, 38 P.3d 12, 28 (2002). The accompanying duty requires "that neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986). An insurer acts in bad faith where it "intentionally denies, fails to process, or pay a claim without a reasonable basis." *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 196 Ariz. 234, 237, 995 P.2d 276, 279 (2000) (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). For an insurer to have a good faith basis to deny a claim, the claim's validity must be fairly debatable. *See Rawlings*, 151 Ariz. at 156, 726 P.2d at 572 ("A failure to pay a claim is unreasonable unless the claim's validity is 'fairly debatable' after an adequate investigation."). However, "while fair debatability is a necessary condition to avoid a claim of bad faith, it is not always a sufficient condition." *Zilisch*, 196 Ariz. at 238, 995 P.2d at 280. Rather, the test is whether "reasonable jurors

could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Id.* (citing *Noble v. Nat'l Am. Life Ins. Co.*, 128 Ariz. 188, 190, 624 P.2d 866, 868 (1981)). A finding of bad faith thus requires two inquiries, one objective (reasonableness) and one subjective (the insurer's state of mind). *See Nardelli v. Metro. Group Property & Cas. Ins. Co.*, 230 Ariz. 592, 597-98, 277 P.3d 789, 794-95 (Ct. App. 2012). Fair debatability is merely one factor in assessing the objective aspect, i.e., whether the insurer's denial was reasonable. *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1094 (D. Ariz. 2003) (citing *Deese v. State Farm Mut. Auto Ins. Co.*, 172 Ariz. 504, 507, 838 P.2d 1265, 1268 (1992)).

The Court concludes as a matter of law that American National acted reasonably in its handling of the Mastowskis' claim. In the first place, the claim was fairly debatable. Significant evidence drawn from a number of sources, both internal and external to American National, pointed to the Mastowskis as having had at least some role in starting the fire. Among other things, both American National's expert and the Casa Grande Fire Department concluded that at the time of the incident the house was locked and showed no signs of forced entry. *See* Doc. 101-2 at 7; Doc. 101-1 at 25. The only evidence to the contrary was the observation of the Mastowskis' own private investigator, who did not examine the house until December of 2015—six months after American National denied their claim and four months after they filed this action. *See* Doc. 118 at 26. The record contains no evidence of forced entry that existed when American National denied the claim. Other circumstantial evidence also pointed to the Mastowskis, including that the fire had been smoldering since roughly the time they left on an overnight drive, the fires were lit with no chemical accelerants, nothing was taken from the home, Charles and Sondra's stories contained inconsistencies, and they may have had financial difficulties motivating them to try and collect on the insurance.

True, there was also some evidence that pointed to the Mastowskis' innocence, such as the Mastowskis' distance from their home at the time the fire was discovered, and

the possibility that a house key or garage door opener may have fallen into the hands of others. Several other people, burglars who had once broken into a neighbor's home and an unknown man observed near the Mastowskis' home several days after the fire, could not be definitively ruled out as potential suspects. But American National expressly acknowledged this evidence in its letter denying the Mastowskis' claim and nonetheless reached the reasonable conclusion that the evidence pointing to the Mastowskis convincingly outweighed anything to the contrary. Bad faith requires more than the mere presence of some speculative evidence weighing against the insurer's decision.

The Mastowskis offer several lines of argument in opposition, none of which is availing. First, they point to numerous supposed deficiencies in American National's decision-making process: the failure "to follow up on leads" for other possible suspects; reliance on "flimsy evidence and illogical conclusions of motive," particularly the "speculation" of a "snoopy neighbor" and the testimony of Detective Bryan Lawrence, one of the officers who initially responded to the fire, who they write off as not credible; reliance on the assumption that the home was "far from ready" for sale based on a single piece of sheet rock requiring replacement; concluding the Mastowskis were in financial trouble despite their solvency at the time of the fire; the failure to interview the Mastowskis' son in Nevada, "who would have corroborated his parents' travel habits"; reliance on Sondra's statement to a neighbor "that she did not like living in Superior" because the home would have still remained there; and a catch-all accusation of American National's reliance on "'evidence' that proved nothing." (Doc. 117 at 12-13.)

The Mastowskis' list is rife with confusion, mischaracterization, and irrelevance. Many things they point to amount to further measures American National could have taken to investigate the claim, none of which, together or individually, establishes a triable issue over bad faith. Interviewing the Mastowskis' son, for instance, would have done little to further the investigation. Nothing in the record—least of all American National's denial letter—suggests American National ever believed that Charles and Sondra were not actually on their way to visit him, nor that they would frequently leave

- 10 -

in the middle of the night to drive to Nevada. The Mastowskis point to no relevant information that might have been gleaned from interviewing their son, and they should know. Moreover, the Mastowskis accuse American National of relying on evidence that the record does not suggest they relied on. For example, the denial letter does not say that their house was "far from ready" for sale, only that "[t]here was at least one unfinished room in the Mastowski residence that was in the process of rehabilitation." (Doc. 101-6 at 21.) The letter says nothing at all about whether Sondra liked living in Superior. And the accusation that American National relied on evidence "that proved nothing" is conclusory and not substantiated by the record. The record shows that American National relied on evidence that the fire was started intentionally, evidence that there was no forced entry into the home, and the independent conclusions of local fire and police officials that no other suspects could be identified. The test for bad faith is not whether the evidence American National relied on was watertight but rather whether "reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." *Zilisch*, 196 Ariz. at 238, 995 P.2d at 280. Nothing in the record suggests American National behaved unreasonably, let alone that it did so consciously.

The Mastowskis also assert that American National made them jump through "unnecessary procedural hoops," such as twenty-six separate requests for information, some of which American National's retained counsel may have had independent access to. (Doc. 117 at 15-16.) They also point to American National requiring them to take part in two examinations under oath "even though [American National] knew that fire modeling could have established the Mastowskis innocence early on." (Doc. 117 at 16.)

For starters, the record contains no evidence that American National "knew" fire modeling could have proved the Mastowskis' claim. American National's investigator noted on a single report that fire modeling "can be completed, if necessary." With so much evidence pointing to the Mastowskis' involvement, American National was

reasonable to conclude in the circumstances of this case that fire modeling was not in fact necessary. The evidence showed the fire was started in multiple places by matches or lighters hours before the fire was discovered. If fire modeling was necessary, the Mastowskis could have done it on this motion and shown its results. They did not. An insurer can act in good faith without taking every possible step to investigate a claim so long as the investigation is sufficiently thorough. The investigation here undoubtedly was thorough.

In any event, the examinations and information requests did not amount to "unnecessary procedural hoops" or a game of "cat and mouse." The Mastowskis contend that American National "continued to demand financial documents that proved little or that quickly proved [they] were honest and had no financial issues." (Doc. 117 at 16.) Yet the Mastowskis cite no specific document requests that they deem were excessive, pointing only to Charles's examination testimony that he and Sondra made their car payments on time. *See* Doc. 118 at 16. That testimony in no way shows that the document requests were excessive.

In addition, the Mastowskis point to the fact that American National's counsel required that they provide him with several police reports despite the fact that he "was in contact with Detective Lawrence, with whom he exchanged documents regularly, and who told him of the information in the police reports." (Doc. 117 at 16.) Yet elsewhere in their briefing, the Mastowskis repeatedly deride Lawrence as possessing a "complete lack of credibility" based on accusations that he lied to a former employer, misled a grand jury, and admitted to destroying evidence from the scene of the fire. (Doc. 117 at 7, 12.) If Lawrence is unreliable, American National could not have engaged in bad faith by working around him and instead seeking documents and information from the Mastowskis directly.

The Mastowskis also make much ado over a deposition given by American National's retained attorney in which he testified he does not believe he is bound by a duty of good faith and fair dealing when investigating an insurance claim on an insurer's

behalf. (Doc. 117 at 11; Doc. 118-26 at 5.) This, the Mastowskis say, is "direct evidence that the Defendant, its employees and agents, acted recklessly in handling the claim." (Doc. 117 at 11.) But regardless of what beliefs the attorney holds generally, the inquiry here must turn on the things American National did—not what its retained counsel professed to believe—in order to determine whether it acted reasonably and believed it was doing so *in this case*. Even judging the facts in the light most favorable to the Mastowskis, the record shows American National considered their claim, thoroughly investigated it, and reasonably concluded it should be denied. The record contains no evidence that either American National or any agent acting on its behalf actually behaved unreasonably or believed their actions to be unreasonable in this case.

### C. Punitive Damages

To receive punitive damages, a defendant must be liable for bad faith and "a plaintiff must prove by clear and convincing evidence that the defendant's conduct was undertaken with an evil mind." *Tritschler v. Allstate Ins. Co.*, 213 Ariz. 505, 517, 144 P.3d 519, 532 (Ct. App. 2006) (internal quotation marks omitted). American National is not liable for bad faith, as discussed above. There would be no basis for punitive damages in any event. An "evil mind" requires either that the "defendant intended to injure the plaintiff" or that the "defendant consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others." *Rawlings*, 151 Ariz. at 162, 726 P.2d at 578. There is no evidence on the record that American National did either of these. As a matter of law, American National cannot be liable for punitive damages.

### D. Expert Witnesses

Each party has also moved to exclude certain expert testimony proffered by the other side. Summary judgment is warranted regardless of how the challenges to expert testimony are decided. But the Court will address them anyway to some extent.

Rule 702 of the Federal Rules of Evidence governs opinion testimony from qualified experts. Testimony is admissible if "the expert's scientific, technical, or other

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," "the testimony is based on sufficient facts or data," "the testimony is the product of reliable principles and methods," and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Where the basis for an expert's testimony has been "sufficiently called into question, . . . the trial judge must determine whether the testimony has a 'reliable basis in the knowledge and experience of [the relevant] discipline." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149 (1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)) (citation omitted).

### 1. Andler

American National moves to preclude the testimony of Patrick Andler, an expert offered by the Mastowskis to testify about a photograph of their home's back door that he says shows evidence of forced entry. American National offers three related arguments for why Andler's testimony should not be admitted. First, they argue that the photograph he will interpret was taken in January of 2016, but that if evidence of forced entry had existed at the time of the fire, the Mastowskis would have and could have documented it then. (Doc. 104 at 7-8.) Second, and related, American National argues that Andler's testimony lacks foundation since neither he nor anyone else can establish that the photograph depicts the door as it was at the time of the fire. (Doc. 104 at 9.) Third, American National argues the photograph should be excluded as irrelevant since it was taken so long after the fire actually happened. (Doc. 104 at 9-10.)

The testimony of Patrick Andler will be excluded. Andler's interpretation of a photograph taken more than a year after the fire occurred does not constitute a reliable application of any expert methodology to the facts of this case. Moreover, Andler's "opinion" itself is difficult to follow and borders on unintelligible. It states:

**Conclusion:**

Based upon all the information available and the application of the recommended scientific methodology it is the opinion of the investigators

- 14 -

> from Andler & Associates that the fire detailed in this incident, has not been proven to a reasonable degree of certainty within the fire investigative profession, when it could have been initiated, by person/s unknown, that either forcibly entered or gained entry by surreptitious means into the residence owned by the Mastowskis. Once inside, person/s unknown committed the act of arson by setting fire to available combustibles in various locations. It is also opined, based upon all information considered, that the Mastowskis did not possess motive or opportunity to commit this arson and were not involved in the initiation of this fire.

(Doc. 104-1 at 6.) The first sentence says "the fire . . . has not been proven to a reasonable degree of certainty . . . ." That formulation would be confusing to a jury. Presumably Andler means that arson by the Mastowskis has not been proven, since it is beyond question that their house burned in a fire. The same sentence continues to say only that "it could have been initiated, by person/s unknown" who "either forcibly entered or gained entry by surreptitious means into the residence . . . ." That just points to a possibility, not to any level of probability. Yet the next sentence silently assumes that it was not the Mastowskis and then says that once inside the house, "person/s unknown committed the act of arson." This falls far short of Rule 702's requirements that the opinion be "based on sufficient facts or data" and "the product of reliable principles and methods" that have been "reliably applied." *See* Fed. R. Evid. 702. It is just a possibility and a guess.

Even if he could offer valid expert insight into what the photo depicts, Andler's testimony would still fall short under the balancing test of Rule 403: any minimal probative value his testimony might offer is vastly outweighed by the risk of confusing the issues, misleading the jury, and wasting time with evidence collected more than a year after the fire. *See* Fed. R. Evid. 403.

As discussed above, the admissibility of Andler's opinions does not change the outcome on summary judgment. Those opinions would not create any material dispute of fact on bad faith or punitive damages, and they do not change the conclusion that a triable issue exists as to breach of contract.

### 2. Plitt

The Mastowskis move to limit the testimony of Steven Plitt, an expert offered by American National to testify about the good faith standard for insurance claim handling. Again, the Court does not rely on Plitt's testimony in granting summary judgment. The Mastowskis raise two main concerns with his expert report. First, they seek to preclude Plitt from testifying that "[t]he equality of consideration standard does not apply in first-party property claims," which they contend is an incorrect statement of law. (Doc. 98 at 2-3.) Second, they seek to preclude Plitt "from commenting on the credibility of the Plaintiffs," in light of a part of his report in which he characterizes Sondra's interactions with police as exhibiting a "lack of clarity and evasiveness." (Doc. 98 at 7-8.)

Regarding the first point, there is some subtlety and uncertainty to what exactly Plitt is saying about "equal consideration" and "fair debatability." It is not necessary to pass judgment on Plitt's opinion by filling in the gaps of his reasoning and analysis. Therefore, the Court declines to do so at this time.

As for the second point, Plitt would not be allowed to opine on credibility of witnesses or on how to interpret evidence the jury is capable of assessing. That is for the jury to determine without his input. Any such portions of his testimony and expert report would be excluded.

IT IS THEREFORE ORDERED that Defendant's Motion to Preclude Testimony of Patrick A. Andler (Doc. 104) is granted.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Preclude Testimony of Steven Plitt (Doc. 98) is granted as to any testimony concerning witness credibility or interpretation of evidence and otherwise denied without prejudice.

/ / /
/ / /
/ / /

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (Doc. 99) is granted as to bad faith and punitive damages and is denied as to breach of contract.

Dated this 25th day of August, 2017.

_____
Neil V. Wake
Senior United States District Judge